UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

|  |  |
|---|---|
| In re<br><br>SEA PINE, INC,<br><br>Debtor. | )<br>)<br>)  Chapter 11<br>)  Case No. 10-10590<br>)<br>)<br>) |

# DEBTOR'S DISCLOSURE STATEMENT WITH RESPECT TO DEBTOR'S SECOND AMENDED PLAN DATED NOVEMBER 29, 2010

Sea Pine, Inc. (the "Debtor"), the debtor-in-possession in the above-captioned case, hereby submits this Disclosure Statement (the "Disclosure Statement") to all known creditors and holders of interests of the Debtor in connection with the Debtor's Second Amended Plan (the "Plan") pursuant to Section 1125 of Title 11 of Chapter 11 of the United States Code (the "Bankruptcy Code or the "Code"). A copy of the Plan, which has been filed with the United Bankruptcy Court, District of Maine (the "Bankruptcy Court"), is attached hereto as Exhibit A.

All capitalized terms used herein but not defined shall have the respective meanings ascribed to them in the Plan. Unless otherwise defined in the Plan or in this Disclosure Statement, the terms used in this Disclosure Statement shall have the meaning given to them in the Code.

All Exhibits to this Disclosure Statement, including the Plan, are incorporated into and made a part of this Disclosure Statement.

## I. INTRODUCTION

This Disclosure Statement will assist creditors in evaluating the Plan, and will assist the Bankruptcy Court in determining whether the Plan complies with all applicable provisions of the Code and should therefore be confirmed. Importantly, this Disclosure Statement may not be relied on for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any other case or proceeding involving the Debtor, the Estate or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan.

Although disclosure statements are customarily designed to assist holders of claims and interests as to whether to accept a plan filed in a Chapter 11 bankruptcy case, the Debtor's Plan in this case does not require voting. Under the Plan, all claims are either satisfied in full or are treated in a manner that is consented to by the holder. Accordingly, this Disclosure Statement is

presented to simply furnish claim-holders and parties-in-interest and the Court with additional information.

The federal, state, and local tax consequences of the Plan may be complex and, in some cases, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or interest. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR, AND SHALL NOT BE DEEMED TO CONSTITUTE, ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN. Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any distributions under the Plan

The Debtor believes the Plan is in the best interests of creditors.

## II. **SUMMARY OF THE PLAN**

Please refer to the Plan attached hereto for further details concerning the classification and treatment of holders of claims against the Debtor. In the event of any inconsistency between the Plan and the description of the Plan contained in this Disclosure Statement, the Plan shall control.

Under the Plan, the Debtor will sell substantially all of its assets to Spruce Point Capital, LLC ("SPC") pursuant to the terms and conditions of that certain Asset Purchase Agreement between SPC and the Debtor, a copy of which is attached as Exhibit A to the Plan (the "Asset Purchase Agreement")[1] and free and clear of all Liens (except the Lien of Ford Credit and Permitted Title Exceptions (as defined in the Asset Purchase Agreement) The Debtor's owners – Joseph Paolillo and Angelo Di Giulian – will hold minority interests in SPC. As a result of the sale, the Debtor's primary secured lender – Savings Bank of Maine ("SBM") will receive Eight Million Dollars ($8,000,000) in full and final satisfaction of its notes, mortgages, guarantees, and related loan documents relating to its loans to the Debtor.

The Plan will be funded from proceeds of the Sale and the Debtor's Cash, which is currently projected to be $380,000 as of the Closing Date (the "Estimated Amount"). Under the terms of the Asset Purchase Agreement, the purchase price consideration will be Eight-Million Three Hundred Fifteen Thousand Dollars ($8,315,000); provided, however, that the purchase price shall be (A) increased by the amount by which the Estimated Amount exceeds the Debtor's Cash (i.e., Debtor's Cash as of the Closing is less than the Estimated Amount), or (B) decreased by the amount by which the Debtor's Cash exceeds the Estimated Amount (i.e., Debtor's Cash as of the Closing is greater than the Estimated Amount). The purchase price under the Asset

---

[1] To the extent that there are any discrepancies between the description of the Asset Purchase Agreement contained herein and the Asset Purchase Agreement, the Asset Purchase Agreement shall control.[2] As of the Filing Date, such room deposits totaled $605,000.

-2-

Purchase Agreement shall be further reduced by the aggregate amount of any discounts to the amount of Allowed Claims as a result of any agreements with holders of such Allowed Claims to accept less than full payment.

The Plan provides that, other than the claim of SBM, all Allowed Claims as of the Closing Date will be satisfied on the Closing Date (or as soon as practicable thereafter) either by payment in full (or such less favorable treatment as the Claimant may agree to) or by SPC's assumption of certain limited obligations described below. Insider Claimants and Holders of Equity Interests will receive nothing under the Plan.

Since SPC is acquiring an operating business, it will be assuming certain limited ordinary course obligations. Specifically, under the terms of the Asset Purchase Agreement, SPC will honor obligations relating to deposits received by customers for future lodging and use of the Debtor's facilities. SPC will assume the Debtor's obligations for electricity, water, sewer and other utilities not yet due and payable as of the Closing Date. SPC will also assume the obligations to Ford Motor Credit with respect to a pre-petition loan for the acquisition of a pickup truck used in the operation of the Inn. Lastly, SPC will take assignment of a two leases for equipment used in the operation of the Inn--one with Agricredit Acceptance, LLC for golf carts and one with US Bancorp Business Equipment Finance for photocopiers.

## III. DESCRIPTION OF THE DEBTOR; PRE-PETITION ACTIVITIES; COMMENCEMENT OF THE CASE; SIGNIFICANT POST-PETITION EVENTS

### A. Events Leading to Bankruptcy.

The Debtor acquired the Spruce Point Inn (the "Inn") in 1990 and, since that time, the current owners, Angelo Di Giulian and Joseph Paolillo, have been continuously involved in its operation. The two started as employees, later became first partial owners and eventually became equal co-owners.

Annual revenues for the Inn peaked at $4 million in 2007. Based on the growth in 2006 and 2007, the Debtor budgeted revenues of $4.7 million for 2008. Revenues were indeed solid until the fall of 2008, when the group and leisure business dropped sharply and without warning. In the wake of the stock market plunge and the hospitality industry-wide contraction which led to stalled bookings for 2009, revenues declined to 3.5 million in 2008 and dropped to 3.0M in 2009. Although the Debtor implemented cost-saving measures to adjust to the rapid decline in revenues, it was unable to timely make its January 2009 payment to its largest secured lender, Saving Bank of Maine ("SBM"). Despite the struggles caused by the recession (and corresponding decline in revenues), the Debtor was able keep loan payments to SBM within 90-days of due dates until December of 2009.

### B. Filing the Petition for Bankruptcy Protection.

From January 2009 through February 2010, the Debtor made proposals to SBM to restructure the SBM loans. These proposals were not acceptable to SBM, and in March 2010, SBM published notice of its intent to foreclose on the Inn. Accordingly, on April 19, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. Simultaneous with the filing of the petition, the Debtor filed motions to honor pre-petition obligations to customers, to continue the utility services at the Spruce Point Inn, to hire Professionals, and to use the Debtor's cash collateral to maintain the Spruce Point Inn.

C.  **Liabilities on the Petition Date and Administrative Claims.**

*Secured Claims.* As of the Petition Date SBM asserted claims against the Debtor in the aggregate amount of $12,440,692 million, which SBM alleges is secured by substantially all of the Debtor's real and personal property. Ford Credit also asserts a secured claim against the Debtor in the amount of $24,761, which Ford Motor Credit, Inc. alleges is secured by a security interest in a Ford truck owned by the Debtor. The Boothbay Harbor Sewer District has asserted a secured claim in the amount of $32,069.70, and the Town of Boothbay Harbor has asserted secured claims for pre-petition real property tax liens in the amount of approximately $92,362.82. Maine Revenue Services has asserted a claim for sales taxes in the amount of $92,533.40, and has recorded a tax lien to secure such claim.

*Administrative Claims.* Unpaid administrative claims of the Debtor's attorneys, accountants, bookkeepers, IT consultants and turnaround consultants through November 21, 2010 totaled approximately $273,608. Fee applications are pending for these amounts. The Debtor has paid on a current basis amounts owed for taxes and insurance, and amounts owed to vendors and suppliers for post-petition goods and services. Other administrative fees consist only of claims of vendors whose invoices have not been received by the Debtor or for which payment is not yet due. The Debtor also has obligations to guests who, post-petition, have sent deposits for lodging or facility use during the 2011 season.

*Priority Claims.* Priority claims total approximately $6,918, not including claims for pre-paid room deposits[2], which claims are being satisfied in the ordinary course of business as authorized by Order of the Court.

*Unsecured Non-Priority, Non-Insider Claims.* Pre-petition non-priority, non-Insider unsecured claims total approximately $157,000.

*Unsecured Non-Priority, Insider Claims.* Pre-petition non-priority, Insider unsecured claims totaling approximately $295,750 are held by the following Insiders of the debtor:

- Joseph Paolillo: $50,000

---

[2] As of the Filing Date, such room deposits totaled $605,000.

- Patsy Di Giulian (as trustee): $250,750

*Unexpired Leases.* The Debtor is aware of two unexpired leases. One with Agricredit Acceptance, LLC for the lease of golf carts and the other to US Bancorp Business Equipment Finance for the lease of photocopiers.

### D. Significant Post-Petition Events.

The Debtors have continued to operate the Inn in the ordinary course of business following the bankruptcy filing. The Debtor's post-petition expenditures have been made under orders of the Court authorizing the use of cash collateral.

### E. Alternatives to Sale to SPC.

On August 16, 2010, the Debtor filed a plan of reorganization which provided for a strip down of the secured debt of SBM, payment of 100% of the allowed claims of priority and general unsecured creditors, an "earn-out" payment to the unsecured portion of the SBM claim, the investment of $200,000 in new value by the Debtor's owners, the cancellation of the interests of the Debtor's owners, and the issuance of 100% of the stock in a reorganized debtor to the owners. SBM opposed that plan, thereby requiring the Debtor to attempt to "cram-down" the plan in litigation over the objection of SBM. Although the Debtor's believe that the plan is ultimately confirmable, SBM's opposition created material litigation expenses and risks. The Debtor believes that the current plan, proposing a sale to SPC with all claims (other than claims held by insiders) paid in full or otherwise satisfied on terms acceptable to creditors, is superior to the cram-down alternative reasonably available to the Debtor.

### F. Claims Bar Date.

By Order of the Court, August 25, 2010 was the date by which proofs of claims for all creditors (other than governmental units) were due.

## IV. FUNDING OF THE PLAN

The Plan shall be funded from the proceeds of the sale of the Debtor's Assets to SPC and the Debtor's Cash. SBM will make a new loan to SPC to satisfy in full the SBM claim. The Debtor estimates the following cash sources and uses of additional funds necessary to effectuate and perform its obligations under the Plan.

The Debtor's projected uses of cash under the Plan are as follows:

| | |
|---|---|
| Maine Revenue Services (*) | $ 92,533 |
| Town of Boothbay Harbor (*) | $ 92,362 |
| Boothbay Harbor Sewer District (*) | $ 32,069 |

2027741_2.DOC
GSDOCS\2027741.2

| | | |
|---|---:|---:|
| Administrative Claims | | $ 292,800 |
| Priority Claim | | $ 6,918 |
| Unsecured Non-Priority, Non-Insider Claims | | $ 157,000 |
| U.S. Trustee Fees | | $ 3,750 |
| Post closing Wind-down expenses | | $ 17,200 |
|    Administrative items to close case and filing of final report | $8,600 | |
|    Inquiries by creditors and parties-in-interest | 1,200 | |
|    Communications with U.S. Trustee's office | 1,000 | |
|    Filing final tax return. | 4,800 | |
|    Disbursing funds to creditors | 1,600 | |

**Total Uses of Cash**     **$ 694,632**

The projected sources of cash to allow the Debtor to fulfill its obligations under the Plan are as follows:

| | |
|---|---:|
| Debtor's Cash: | $ 380,000 [3] |
| Cash Paid by SPC at closing: | $ 315,000 |

**Total Sources of Cash**     **$ 695,000**

(*) these Claims will be paid directly by the escrow agent under the Asset Purchase Agreement

## V. **FEASIBILITY OF THE PLAN**

With the consensual resolution of the amount of the SBM Claim and the purchase of the Debtor's assets by SPC on the terms set forth in the Plan and Asset Purchase Agreement, the Plan is feasible within the meaning of section 1129(a)(11) of the Code, which requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

The only issue that touches on feasibility is SPC's ability to close the sale. The Debtor believes that SPC has the capacity to close. More than 90% of the purchase price will be paid to SBM. SBM has informed the Debtor that it is willing to provide financing to SPC that will allow SBM to receive the $8 million that SBM requires as full and final satisfaction of all amounts owed by the debtor to SBM. The Debtor believes that SPC has or will shortly have adequate cash to fund the cash component of the transaction.

---

[3] As a condition to the closing of the Sale, the Debtor shall have caused American Express to release to the Debtor all but $19,000 of a reserve in the total amount of approximately $175,000 and shall have caused Central Maine Power to release to the Debtor a $15,000 deposit.

Since SPC is acquiring a going concern business, it will assume certain limited obligations necessary to operate the business. Under the Asset Purchase Agreement, SPC has agreed to honor Customer Deposits. SPC has agreed to assume the obligations to Ford Credit with respect to a truck used in the operation of the business and to take assignment of a lease for golf carts and a lease for photocopiers which are used in the operation of the business. Finally, SPC will assume the Utility Charges.

The Debtor has a valuable core of guests who return each year, as well as a strong track record of attracting new guests each season. In addition, the Debtor has an established history of generating revenue by hosting functions, such as weddings, family reunions and corporate events. This going-concern, goodwill value will be conveyed to SPC.

## VI. OWNERSHIP OF SPC

As of the Effective Date of the Plan, the Inn shall be owned by SPC. SPC is a limited liability company formed to purchase substantially all of the Assets of the Inn. The Debtor's current owners--Angelo Di Giulian and Joseph Paolillo—will hold minority interests in SPC.

## VII. CONFIRMATION

The Debtor believes all requirements of confirmation will be met, including satisfaction of all required provisions of 11 U.S.C. § 1129(a), and, if necessary, § 1129(b).

## VIII. BEST INTERESTS TEST

The Code provides that the Plan will not be confirmed, regardless of whether anyone objects to confirmation, unless the Bankruptcy Court first finds that the Plan is in the "best interests" of all classes of Claims or Equity Interests that are impaired. The "best interest test" will be satisfied in this Case by a finding by the Bankruptcy Court that either (i) all holders of impaired Claims or equity interests have accepted the Plan, or (ii) the Plan provides a holder that has not accepted that Plan with a recovery at least equal in value to the recovery such holder would receive if the Debtor were liquidated under chapter 7 of the Code.

Under the Plan, all claims are unimpaired other than the claims of SBM and Ford Motor Credit. Because those two claim holders have agreed to (and have "accepted") their treatment under the Plan, no further "best interests of creditors" test is required. Even if it were required, however, the Plan easily meets it. The face value of the secured claims in this case are $12,682,417.[4] An appraisal performed for the debtor shortly before the petition date concluded that the Inn had a going-concern, fair market value of approximately $6.3 million. Even if the appraisal was off by 100%, (and assuming that the claims of secured creditors are allowed), no

---

[4] This consists of Savings Bank of Maine ($12,440,692); Maine Revenue Services ($92,533); Town of Boothbay Harbor ($92,362); Boothbay Harbor Sewer District ($32,069); and Ford Credit ($24,761).

-7-

funds would likely be available for unsecured creditors. In a Chapter 7 liquidation, good will and going concern value would be lost, the Inn would likely sell for less than $6.3 million. In contrast, under the Plan, SPC will pay more than $8 million, and all creditors will be paid *in full* (subject to the agreement of any creditors to accept less than full payment). Accordingly, the best interests test is satisfied.

## IX. CONCLUSION.

The Debtor believes that confirmation of the Plan would be in the best interest of creditors.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: November 29, 2010                    Respectfully submitted,

                                            SEA PINE, INC.

                                            _____
                                            Joseph Paolillo
                                            Its President

                                            - and -

                                            By its attorneys,

                                            _____
                                            Roger A. Clement, Jr., Esq.
                                            Gayle H. Allen, Esq.
                                            Nathaniel R. Hull, Esq.

VERRILL DANA LLP
One Portland Square
P.O. Box 586
Portland, ME 04112-0586
207-774-4000 - Phone
207-774-7499 - Fax
rclement@verrilldana.com
nhull@verrilldana.com
bankr@verrilldana.com